### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

OMAR ASHANTI JOHNSON, #K74565,   )
   )
      **Plaintiff,**   )
   )
vs.   )      **Case No. 25-cv-00702-SMY**
   )
LATOYA HUGHES   )
and ANTHONY WILLS,   )
   )
      **Defendants.**   )

### MEMORANDUM AND ORDER

**YANDLE, Chief District Judge:**

This matter is before the Court for preliminary review of Plaintiff Omar Ashanti Johnson's

First Amended Complaint (Doc. 14).  Plaintiff filed this action pursuant to 42 U.S.C. § 1983 for

constitutional deprivations caused by alleged prolonged exposure to environmental smoke and

other toxins at Menard Correctional Center.  He seeks money damages and injunctive relief.  The

First Amended Complaint is subject to review under 28 U.S.C. § 1915A, which requires the Court

to screen and dismiss portions that are legally frivolous or malicious, fail to state a claim for relief,

or request money damages from an immune defendant.  *Id*.

### First Amended Complaint

Plaintiff makes the following allegations in the First Amended Complaint (Doc. 14, pp. 1-

26): Plaintiff transferred from Hill Correctional Center to Menard Correctional Center on

December 28, 2023.  *Id*. at 8.  He was housed in Menard's Segregation Building and/or East House

thereafter.  In both locations, Plaintiff was exposed to secondhand smoke from drugs smuggled

into the prison on colorless paper that was saturated with K2, fentanyl, roach spray, etc.  *Id*.  His

prolonged exposure to the smoke caused him to experience symptoms of drug use, including

1

behavioral changes, hallucinations, psychosis, eye redness, headaches, diarrhea, and even withdrawal when leaving the facility on court writs. *Id*. at 13. Over time, Plaintiff's heart rate, blood pressure, cholesterol, and kidney "numbers" also became elevated. *Id*.

Illinois Department of Corrections (IDOC) Director Latoya Hughes created this toxic and deadly environment. *Id*. at 8. In 2023, IDOC facilities were dealing with widespread drug problems caused by drugs that were smuggled into facilities on colorless drug-laced paper and nearly impossible to detect. Inmates would burn or smoke it, filling the air with toxic chemicals. Some inmates overdosed, while other inmates and staff became ill. *Id*.

Director Hughes was aware of the problem. To manage it, she decided to move all inmates with drug issues to a single facility: Menard. To accomplish this, Director Hughes used disciplinary transfers to relocate inmates found guilty of, or under sustained investigation for, buying, selling, or using deadly drugs to Menard's Segregation Building or East House. *Id*. at 10. By concentrating the drug problems and drug offenders in the same location, IDOC staff could better monitor drug behavior. Plaintiff refers to this policy as the "narcotics-offenders-transfer-to-Menard" policy. *Id*.

Menard's Segregation Building and/or East House housed almost a thousand inmates at the time. All inmates were exposed to airborne, noxious chemicals. *Id*. at 10-11. The smell of toxic smoke was obvious. *Id*. Director Hughes was aware of it because she toured the facility with a "wrinkled up nose" and "stank face" appearance in January 2024. *Id*. She also knew that Menard's Chief Engineer had declared the prison's ventilation system inadequate. The same month, Plaintiff wrote Director Hughes a long letter detailing the civil and human rights violations caused by the toxic air and failed ventilation system in Menard's Segregation Building. Plaintiff wrote a second letter to complain of the same issues in Menard's Segregation Building and East

House in October 2024.  By this time, several inmates had overdosed from drug use and several staff members had been hospitalized from secondhand smoke exposure.  *Id*. at 12.  These events drew the attention of local news outlets, state legislators, and the federal government.  *Id*.

Warden Anthony Wills was also aware that Menard's Segregation Building and East House were filled with toxic gas.  He regularly walked past cells with inmates smoking the toxic substances, and took no action to stop them.  The smell of the smoke was obvious.  However, Warden Wills intentionally disregarded it because he adopted and implemented a "let 'em smoke" or "keep 'em sedated" policy to manage uncontrollable inmates.  *Id*.

Plaintiff sent three emergency grievances to the warden in January 2024, March 2024, and September 2024.  *Id*. at 14.  In the first, he complained about the warden's "criminal housing management," saying that it exposed inmates to deadly narcotic smoke, a failed ventilation system, pervasive black mold, and "inches thick" dust mites in Menard's Segregation Building.  *Id*.  The grievance office never recorded this first emergency grievance, and the warden disregarded it.

Plaintiff sent the warden a second emergency grievance in March 2024.  This time, he also pointed out that nearly a thousand inmates were being held in toxic air for months at a time in Menard's Segregation Building and East House.  He restated his concerns in a third emergency grievance filed in September 2024.  The third emergency grievance coincided with a "massive staff hospitalization" following their widespread exposure to secondhand smoke in Menard's Segregation Building and East House.  *Id*. at 15.

Based on the allegations, the Court designates the following claims in the *pro se* First Amended Complaint:

> **Count 1:**     Eighth Amendment deliberate indifference claim against Director Hughes for implementing a "narcotics-offenders-transfer-to-Menard" policy that caused Plaintiff's prolonged exposure to toxic chemicals in Menard's Segregation Building and/or East House, resulting in symptoms of drug use

upon exposure and elevated his heart rate, blood pressure, cholesterol, and kidney "numbers" over time.

**Count 2:**    Eighth Amendment deliberate indifference claim against Warden Wills for implementing a "let 'em smoke" or "keep 'em sedated" policy that caused Plaintiff's prolonged exposure to toxic chemicals in Menard's Segregation Building and/or East House, resulting in symptoms of drug use upon exposure and elevated his heart rate, blood pressure, cholesterol, and kidney "numbers" over time.

Any other claim mentioned in the First Amended Complaint but not addressed herein is considered dismissed without prejudice as inadequately pled under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (action fails to state a claim if it does not plead "enough facts to state a claim to relief that is plausible on its face").

## Discussion

The Eighth Amendment protects inmates from prison conditions that deny them "the minimal civilized measure of life's necessities," including adequate shelter, food, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To state a colorable claim in this context, Plaintiff must plead facts suggesting that each defendant knew of and disregarded a substantial risk of serious harm to his health posed by the constitutionally objectionable living condition. *Id*. at 847. Negligence does not support a constitutional claim. *Id*.

Here, Plaintiff describes an objectively serious risk to his present and future health that was triggered by prolonged exposure to secondhand smoke from drug-laced paper in a poorly ventilated space. This exposure allegedly caused Plaintiff to suffer symptoms of drug use including behavioral changes, hallucinations, psychosis, eye redness, headaches, diarrhea, and withdrawal, as well as an elevated heart rate, blood pressure, cholesterol, and kidney numbers.

Plaintiff alleges that Director Hughes and Warden Wills were deliberately indifferent to this harm when they adopted and implemented two policies that caused it. First, Director Hughes

4

implemented a "narcotics-offenders-transfer-to-Menard" policy, which concentrated all IDOC drug offenders, drug users, and drug use in two areas of Menard (*i.e.*, Segregation Building and East House). Second, Warden Wills implemented a "let 'em smoke" or "keep 'em sedated" policy to manage uncontrollable inmates (*i.e.*, by intentionally keeping them drugged). Together, these policies allegedly caused prolonged exposure to toxic fumes and posed a serious risk of harm to Plaintiff's present and future health.

Plaintiff also alleges that after implementing these policies, both defendants were aware of the ongoing use of drugs in Menard's Segregation Building and East House from touring those areas and observing inmates smoking drug-laced paper and did not stop them. Plaintiff also put these defendants on notice by submitting letters and emergency grievances that described the impact these conditions had on him and other inmates. These allegations state a viable deliberate indifference claim against these defendants. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Oliver v. Deen*, 77 F.3d 156, 159-60 (7th Cir. 1996) (Eighth Amendment claim stated by endangerment to existing and future health from ETS); *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) (same).

## Injunctive Relief

Plaintiff seeks injunctive relief, including: (1) an order for his transfer to escape the prison's toxic and deadly air; (2) an order expunging all past disciplinary tickets for misconduct influenced by his exposure to drugs in Menard's Segregation Building and East House; and (3) an order for immunity from all future drug-related disciplinary tickets. (Doc. 14, p. 15). These requests for relief will be treated as requests for relief ***at the close of the case***.

Plaintiff also seeks an "emergency" transfer. This request is denied. *Id*. Plaintiff makes this request in a First Amended Complaint filed in 2026, based on events described in 2023 and

2024. He does not indicate whether he is suffering from ongoing exposure to the secondhand smoke in a poorly ventilated Segregation Building and/or East House. He has filed no motion for a temporary restraining order (TRO) or preliminary injunction at any point in this litigation. *See* FED. R. CIV. P. 65(a)-(b).

Soon after filing the First Amended Complaint, Plaintiff filed a notice of address change indicating he would be *returning* to Menard. (Doc. 15). This suggests he was not at Menard when he sought the emergency transfer in his First Amended Complaint. However, Plaintiff did not disclose any other address where he was located, reveal how long he was away from Menard, or indicate where he would be housed when he returned to Menard. Thus, the Court is unable to assess his *current* housing and whether he faces the same conditions described in the First Amended Complaint (*i.e.*, "toxic-deadly air" in Menard's Segregation Building or East House). As such, Plaintiff's request for emergency relief is thus **DENIED.** If Plaintiff wishes to seek emergency relief during the pending action, he may file a Rule 65 motion stating the exact relief he requires and the reasons he requires it.

### Disposition

The First Amended Complaint (Doc. 14) survives screening under 28 U.S.C. § 1915A. **COUNT 1** will proceed against **LATOYA HUGHES**, in an individual capacity for money damages and in an official capacity for injunctive relief. **COUNT 2** will proceed against **ANTHONY WILLS**, in an individual capacity for money damages and in an official capacity for injunctive relief.

The Clerk shall prepare for Defendants **LATOYA HUGHES** and **ANTHONY WILLS**: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the First Amended Complaint (Doc. 14), and this Memorandum and Order to each Defendant's place

of employment as identified by Plaintiff. If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on Defendant. The Court will require that Defendant to pay the full costs of formal service, as authorized by the Federal Rules of Civil Procedure.

If a Defendant cannot be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with that Defendant's current work address, or, if not known, the Defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk and shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file appropriate responsive pleading to the First Amended Complaint (Doc. 14) and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). **Pursuant to SDIL-Local Rule 8.2, Defendants need only respond to the issues stated in this Merit Review Order**.

Plaintiff is **ADVISED** that if judgment is rendered against him and the judgment includes the payment of costs under 28 U.S.C. §1915, he will be required to pay the full amount of the costs, even though he was granted *in forma pauperis* status. *See* 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is further **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and the opposing parties informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **14 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**The Clerk's Office is DIRECTED to ENTER the standard qualified protective order pursuant to the Health Insurance Portability and Accountability Act.**

        **IT IS SO ORDERED**.

        **DATED: 5/26/2026**

                                        **STACI M. YANDLE**
                                          **Chief U.S. District Judge**

### Notice to Plaintiff

Once identified, the Court will take the necessary steps to notify the Defendants of your lawsuit and serve them with a copy of your First Amended Complaint. After service has been achieved, Defendants will enter their appearances and file Answers to your First Amended Complaint. It will likely take at least **60 days** *from the date they are served with this lawsuit* to receive the Answers, but it is entirely possible that it will take **90 days** or more. When all Defendants have file Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for Defendants before filing any motions, to give the Defendants notice and an opportunity to respond to those motions. Motions filed before Defendants' attorneys have filed appearances will generally be denied as premature. Plaintiff need not submit any evidence to the Court at this time, unless specifically directed to do so.